### STATE OF MINNESOTA *vs.* ANDREW ANDERSON.

## May 10, 1878.

**Larceny of Money—Description in Warrant.**—A warrant for larceny, which alleges that the offence was committed "by feloniously taking, stealing, and carrying away from the possession of the complainant, four dollars and sixty cents, lawful money of the United States of America, of the following denominations, to wit: one two-dollar bill, two one-dollar bills, and one fifty-cent scrip, and one ten-cent scrip, the property of the complainant," is sufficient as to the description and value of the property.

**Offence Committed near County Line—Where Triable.**—An offence triable before a justice of the peace, may, if committed within one hundred rods of the dividing line between two counties, be prosecuted and tried before a justice in either county, under Gen. St. *c.* 108, § 20.

**Conditional Delivery—Passing of Title.**—A conditional delivery of personal property, by the owner, to another, upon an understanding that the latter is forthwith to give, in exchange therefor, a five-dollar bill, does not operate to transfer any absolute legal possession, or right of possession, to the property so delivered, till performance of the condition.

**Same—Larceny by Receiver.**—If the party receiving such delivery wrongfully retains and carries off such property, against the consent of the owner, he thereby becomes a trespasser, and if he does it *animo furandi*, he is guilty of larceny.

The defendant was convicted, before a justice of the peace in Scott county, of the crime of larceny. He appealed, on questions of law and fact, to the district court for that county, where he was tried before *Macdonald,* J., and a jury, and again convicted. Sentence was passed upon him, and from this judgment he appeals. To the statement of facts in the opinion, it may be added that the centre of the main channel of the Minnesota river is the dividing line between Hennepin and Scott counties.

*Henry Hinds,* for appellant.

*Geo. P. Wilson,* Attorney General, for the State.

CORNELL, J. The offence charged against the defendant is that of larceny, committed, as is alleged, "by feloniously taking, stealing and carrying away from the possession of the

complainant, four dollars and sixty cents, lawful money of the United States of America, of the following denominations, to wit, one two-dollar bill, two one-dollar bills, and one fifty-cent scrip, and one ten-cent scrip, the property of the complainant," etc. The phrase "four dollars and sixty cents, lawful money of the United States of America," necessarily imports that much of value, and its meaning would not have been any more clear if the pleader had added thereto the words, "of the value of four dollars and sixty cents." The objection that the warrant fails to state the value of the property stolen, is, therefore, untenable. The description of the property is sufficiently definite and certain fully to apprise the accused of the specific offence with which he was charged, and "to enable the court to pronounce judgment, upon a conviction, according to the right of the case." Gen. St. *c.* 108, § 10. It is perfectly clear, to the most common apprehension, that the property which the defendant is charged to have stolen consisted of such bills and scrip as are authorized, by the laws of the United States, to circulate as money. The omission, therefore, to state in the warrant whether the bills were treasury notes, or national-bank notes, is not, in our judgment, a fatal defect. The denomination, and the number of each denomination, are given. The offence was the same, whether the bills stolen were all treasury-notes or bank-notes, or whether they consisted partly of each. The main office of the description was to specify the offence with such a degree of particularity as to guard the accused against any surprise on the trial, and fully protect him from a second conviction for the same offence. In case defendant is ever subjected to another prosecution for the same offence charged against him in this warrant upon which he has been convicted, there can be no difficulty, under a plea of former conviction, in identifying it, and the particular transaction out of which it arose.

Within the doctrine of *State* v. *Taunt,* 16 Minn. 110, the

warrant is good.    See, also, *State* v. *Beebe*, 17 Minn. 249, and *State* v. *Hockenberry*, 30 Iowa, 504.

2. It is objected that the justice had no jurisdiction over the offence, because it was committed just outside the territorial limits of Scott county, though within one hundred rods of the boundary line.

In *State* v. *Robinson*, 14 Minn. 447, this court sustained an indictment found by the grand jury of Carver county, for an offence committed in Scott county, within one hundred rods of the dividing line between those counties, on the ground that Gen. St. *c.* 108, § 20, extended territorially the criminal jurisdiction of the district court that distance beyond the boundary line of the county wherein it was sitting.    The question now presented is whether this section is also applicable to justices' courts.    It is insisted by defendant that it is not, because the introduction of the section into the chapter relating to indictments, and the use of the word "indictment" in the section itself, both indicate an intention to confine its provisions to criminal proceedings by indictment alone.    The section is as follows : "Offences committed on the boundary lines of two counties, or within one hundred rods of the dividing line between them, may be alleged in the indictment to have been committed in either of them, and may be prosecuted and punished in either county."    The fact that this section is found under the head of "indictments," is by no means conclusive of a legislative intent to limit its applications to proceedings by indictment.    The inference sought to be drawn from this fact is rebutted, in part, at least, by the fact that the provisions of sections twelve and thirteen, of the same chapter, have a general application to pleadings in all courts.

Criminal offences are often committed on, or so near, a dividing line between two counties, as to render it difficult, if not altogether impracticable, to determine with certainty within which of the two they were in fact committed.    In such cases, in the absence of any suitable statutory provision meeting them, doubts necessarily exist concerning the right

venue for the prosecution and trial, and many embarrassing questions, growing out of this uncertainty, must frequently arise, difficult of solution, if not prejudicial to the interests of public justice. To obviate these doubts, and avoid all such questions, was the obvious purpose of this section of our statutes, and its provisions should be benignly interpreted to this end. Thus considered and construed, the provision that "offences committed" in the places mentioned, "may be alleged, in the indictment, to have been committed in either" county, must be held as simply providing a rule of pleading for such cases, and not as limiting the general scope of the section, or the offences which it declares "may be prosecuted and punished in either county." The beneficial purpose of the statute is best subserved in holding the latter clause as applicable to all offences committed within the territorial limits designated, whether indictable or not, and in harmony therewith is the preceding clause, which obviates all difficulty in pleading the fact as to the precise place of the commission of the offence, whenever it becomes necessary to state it in an indictment. If, in the administration of criminal law, this enactment is needful for district courts, it is equally so, and for like reasons of public policy, for justices of the peace, as examining and committing magistrates, or as trial courts for minor offences; and this suggests that its provisions should be construed as extending to both, unless a contrary construction is constrained by the plain import of its language.

In *Commonwealth* v. *Gillon*, 2 Allen, 502, the precise question here presented was considered and determined. In that case, the jurisdiction of a police court over an offence committed in an adjoining county, but within one hundred rods of the boundary line, was objected to, under a statute substantially identical with our own, and upon the same grounds urged by defendant in this case. The objections were overruled, and the jurisdiction sustained by the supreme court, in an opinion in which a construction was given to the statute,

such as we feel no hesitation in adopting and following as correct. Defendant's second point is therefore overruled.

3. The facts testified to in connection with the alleged larceny, briefly stated, are these: The accused, being in a buggy, and in a hurry to cross the Minnesota river, applied to one Baldwin, the complaining witness herein, who was operating a ferry, to cross him over as quickly as possible, in order to enable him to reach a train on the Minneapolis and St. Louis railroad. While being ferried hurriedly over, but before reaching the opposite shore, he asked Baldwin, on being told the amount of the fee or charge, if he could change a five-dollar bill. The latter at once took out his wallet, stepped between the wheels, and, as the wind was blowing at the time, proceeded to count out the required amount, in change, over and above the ferriage fee, placing it in the bottom of the buggy, in front of defendant, who was on the seat. About this time, the boat struck the shore, and the ferryman stepped back and seized the rope, in order to hold the boat, leaving the money in the buggy. Thereupon, the accused, without delivering over the five-dollar bill, immediately drove off, and took with him the money so counted out for change. There was also further testimony in regard to his subsequent conduct, bearing upon the question of felonious intent.

Upon this state of facts it is claimed by defendant that the possession of the money, which is the property alleged to have been stolen, was voluntarily surrendered to him by Baldwin, the owner, and that the court, therefore, erred in not giving to the jury the following requests, asked by him, without any qualifications, viz., "(1) that to make the carrying away stealing, the first taking must have been a trespass; (2) that to be stealing, the original intent in taking the property in question must have been felonious." Considered in connexion with the testimony, these requests, without explanation, were clearly objectionable, as liable to mislead the jury. They were calculated to create the impression that the "carrying away," and the "first taking," therein mentioned, referred to

two wholly separate and disconnected acts, and that proof of some tortious and felonious act of taking, distinct and prior to that of carrying away the money charged to have been stolen, was necessary to sustain a conviction. As an inference, the jury might very naturally suppose they ought to acquit, unless they were able to find the existence of the *animus furandi*, at the precise moment when the defendant first obtained qualified possession of the property, by its being placed and left in his buggy by Baldwin, for the special purpose, and under the circumstances indicated in the evidence, or, in case they should find that that possession was not in itself tortious and unlawful, because no purpose had then been conceived to hold it contrary to the wishes and intention of the owner. It is plain that a conclusion reached under the influence of such views would be the result of a total misapprehension of the legal principles properly applicable to the facts which the evidence in the case tended to establish. Such evidence was sufficient to justify the jury in finding, as conclusions of fact, that the defendant offered to pay Baldwin the ferriage which was his due, out of a five-dollar bill, if the latter would make the requisite change; that Baldwin, assenting thereto, thereupon counted out the required sum, and placed it in the defendant's buggy and control, for the sole purpose of complying with the terms of the offer on his part, and thus getting his pay; that the defendant, instead of carrying out his part of the offer, by delivering over the five-dollar note, as contemplated, immediately drove off with the money which he had thus obtained of Baldwin, against his protest, and with the felonious intent of stealing it. All these acts were inseparable parts of one continuous transaction. It is immaterial at what precise moment of time, during the transaction, the felonious intention was first formed of taking and holding the money against the consent of the owner; whenever it was formed and executed, *animo furandi*, by carrying it off, that moment he became a trespasser, and was guilty of larceny. That he may have had no wrongful

intent, in fact, at the precise point of time when he first received the money into his buggy from Baldwin, was not a controlling circumstance in determining the question of his guilt or innocence of the offence charged; for the delivery to him of the property, under the circumstances, was only a conditional one, out of which no legal possession nor right of possession, against the owner, could spring, except upon performance of the condition. His retention of the money without such performance, and against the consent of the owner, was wrongful, and made him a trespasser; and if this was also done with a felonious intent of stealing, he became criminally liable.

Taken as a whole, the charge, as given, was substantially in accordance with these views, and there is no error upon which a new trial ought to be awarded.

Judgment and sentence affirmed.