907 P.2d 319 (1995)
80 Wash.App. 162
The STATE of Washington, Appellant,
v.
Carolyn Ann KEALEY, Respondent.
No. 17527-4-II.
Court of Appeals of Washington, Division 2.
December 19, 1995.
As Amended on Denial of Reconsideration February 26, 1996.
*321 Winnifred Ann Clements, Cowlitz County Pros. Atty. Office, Kelso, for Appellant.
Steven Whitman Thayer, Thayer & Muenster, Vancouver, for Respondent.
*320 WIGGINS, Judge.
Defendant Carolyn Ann Kealey misplaced her purse in a department store. Store personnel found unlawful drugs in the purse and contacted the police. Knowing the purse contained drugs, the police officers did not obtain a warrant, but searched the purse for identification. We hold that Kealey reasonably expected that her purse would remain private. We further hold that police may search misplaced property for identification without a search warrant. The police officers' knowledge of the presence of unlawful drugs did not undermine the right to search for identification. We reverse the trial court's order suppressing the identification evidence and remand for trial.

FACTS
During the evening of April 6, 1993, two women entered the shoe department of the Bon Marche department store in Kelso. One woman purchased a pair of shoes and the two left for another department to purchase a matching dress. A shoe department clerk noticed one of the women had left her purse at the end of a shoe department couch. The clerk put the purse behind the counter, thinking that the women would return to retrieve it.
After a few minutes, the clerk took the purse into the back room and opened it *322 because "I was curious, I wanted to see what was in it. I just looked in it." She removed a make-up bag from the purse, and thought she smelled marijuana in the bag. She did not see any drugs inside, and she did not attempt to look for identification. Without replacing the make-up bag, she shut and tossed the purse into a corner. Five minutes later, the two women returned to the shoe department and asked the clerk if she had seen the purse. The clerk lied and said she had not. The clerk explained at the suppression hearing that she did not want the women to know she had found marijuana in the bag.
The women looked for the purse throughout the shoe department and elsewhere in the store. The store manager helped them search the shoe department. The women were frantic because the purse was missing and "real mad, real angry, real frustrated." Unable to find the purse, the two women left shortly after the store's closing time.
The next morning the shoe department manager noticed the makeup bag that had been left on her desk. She picked it up and smelled marijuana. She unzipped the make-up bag and saw a baggie containing what appeared to be marijuana. The department manager incorrectly assumed that the make-up bag belonged to the clerk. The assistant store manager searched the bag and found, not only the baggie of marijuana, but also a larger package containing a white powdery substance and a smaller bag containing a hard rock crystal substance.
The assistant store manager then contacted the local narcotics task force. Detective Ray Hartley examined the make-up bag, finding a baggie of marijuana and a larger baggie containing white powder, which he believed to be methamphetamine. The clerk who had originally found the purse explained that two women shoppers had left the purse. The clerk then produced the zipped leather purse and the police examined it. According to Detective Hartley, "no thought was ever given to obtaining a warrant before searching the purse. Nor was any thought given to justification for a warrantless search. The search of the purse was undertaken simply to establish its ownership." The detectives re-examined the purse after returning to their office. "Once again, no effort to obtain a warrant was made. The only justification for the search of the purse was to locate identification."
The detectives found in the bag two rent checks made out to Carolyn Kealey and an AT & T long distance card in her name. These items were the only evidence of the ownership of the purse. After discovering Kealey's name, the police officers set up a sting operation, resulting in Kealey's arrest. She was charged by information with five counts of drug related charges under RCW 69.50.401.
Kealey moved to suppress all evidence gathered as a result of learning Kealey's identity, including evidence gathered from the sting operation. The trial court determined that the warrantless search of the purse was not within any exception to the warrant requirement and therefore violated the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. The court suppressed all evidence seized during the search. The court determined that "[b]ut-for the unlawful search of the purse law enforcement would have had no means of locating and/or identifying Carolyn Kealey." Consequently, the court suppressed all evidence gained from the sting operation as fruits of the unlawful purse search. The trial court dismissed the charges against Kealey because of the lack of identification tying her to the drugs.
The State appeals the trial court's suppression of the evidence and dismissal of the action. The State does not assign error to the findings of facts, which we treat as verities on appeal.[1]

ANALYSIS

Search
The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. Since the detectives examined *323 the purse without a warrant, we determine whether the State's actions were within the scope of the Fourth Amendment, specifically whether a "search" occurred.
The landmark case for determining whether a search has occurred is Katz v. United States.[2]Katz and following cases have held that a search occurs if the police intrude into affairs in which a person has a reasonable expectation of privacy.[3] The Katz court found a search when government agents monitored the defendant's conversation in a public telephone booth, and held that the defendant was entitled to assume that the words he uttered into the mouthpiece would not be broadcast to the world.[4] By contrast, the Court held that there was no search in Smith v. Maryland when government agents installed a pen register at the telephone company to monitor telephone numbers dialed by the defendant.[5] The Smith court reasoned that people do not expect dialed telephone numbers to remain confidential.[6]
The test to determine if a person has a reasonable expectation of privacy is twofold: (1) Did the person exhibit an actual (subjective) expectation of privacy by seeking to preserve something as private? (2) Does society recognize that expectation as reasonable?[7] These subjective and objective elements tend to merge into one another.

Subjective Expectation of Privacy
The burden is on the defendant to establish a subjective expectation of privacy.[8] The court must determine whether the defendant "took normal precautions to maintain his [or her] privacy."[9] "What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection. But what he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."[10]
Kealey demonstrated she took normal precautions to preserve the privacy of her purse.[11] The purse was zipped shut and closed to public viewing. She left the purse in the area where she was trying on shoes. It was left unattended for only a few minutes before the women returned for the purse. Engaging the assistance of the store manager and the clerk, the women searched the shoe department and the rest of the store for the purse. The fact that Kealey did not succeed in regaining her purse is not critical to our analysis; rather, we focus on her efforts to maintain her privacy.[12]
Misplacing the purse is not enough to demonstrate that she did not seek to keep it *324 private.[13] "Just because the accused temporarily relinquishes physical possession of the object, he [or she] does not ipso facto forego his [or her] expectation of privacy."[14] By returning shortly after misplacing the purse, Kealey demonstrated that she sought to preserve the privacy of her purse.[15] Kealey subjectively expected that the contents of her purse would remain private.

Reasonable/Objective Expectation of Privacy
An expectation of privacy must be reasonable, i.e., one "rooted in `understandings that are recognized and permitted by society.'"[16] Purses, briefcases, and luggage constitute traditional repositories of personal belongings protected under the Fourth Amendment.[17] The very purpose of a purse is to serve "as a repository for personal, private effects" when one wishes to carry them.[18] In State v. Johnston, police arrested the defendant at the restaurant where she worked and seized her purse from a nearby trailer office.[19] The police then searched the purse without a warrant, and this court suppressed the results of the search, stating: "It would be difficult to define an object more inherently private than the contents of a woman's purse. Most certainly there was a reasonable expectation of privacy in the contents of Mrs. Johnston's purse."[20] Thus, a purse is inevitably associated with an expectation of privacy.[21]
The precise issue here is whether, in the eyes of society, a person loses a reasonable expectation of privacy in a purse after misplacing the purse. We resort to the common law of personal property to assist us:
The laws of trespass and tort are not controlling when considering whether the Fourth Amendment applies or is violated in a particular case, but reference to those laws may be helpful in resolving whether a person has a reasonable expectation of privacy under the Fourth Amendment.[22]
We recognize that Fourth Amendment interests are not coextensive with common law property rights.[23] In Katz, for example, the Court found a reasonable expectation of privacy in the defendant's telephone conversation even though government agents never invaded a tangible property interest or the physical space of the public telephone booth.[24] But changing societal expectations over the centuries have shaped and reshaped the common law. The United States Supreme Court has acknowledged the role of the common law in this area, observing that "property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable."[25] *325 Our Legislature has recognized this role by providing that the common law supplements both civil and criminal law in Washington.[26] Recourse to the common law anchors this court's constitutional interpretation in the reality of social expectations.
The common law distinguishes among property that is abandoned, lost, or misplaced. Property is abandoned when the owner intentionally relinquishes possession and rights in the property.[27] Property is lost when the owner has parted with possession unwittingly and no longer knows its location.[28] Property is mislaid when the owner intentionally puts it in a particular place, then forgets and leaves it.[29] For the purposes of this case, we see no meaningful distinction between lost and mislaid property, and we treat them interchangeably.
A person who abandons property loses any ownership interest in the property,[30] and relinquishes any reasonable expectation of privacy in it.[31] By contrast, at common law, one does not relinquish ownership in goods by losing or misplacing them: "`Finders keepers, losers weepers' is a time-worn old saying, but not true. The finder of lost goods is a bailee of them for the true owner with certain rights and obligations...."[32] Mislaid property is presumed to have been left in the custody of the owner or occupier of the premises upon which it is found. When an owner takes possession of mislaid property he or she becomes a gratuitous bailee by operation of law.[33] The owner of mislaid property is constructively in possession although the property may be in custody of another on whose premises it has been left.[34] "The owner is treated as still constructively in possession of it, although its custody may be in another, in whose shop ... it has been left."[35] A gratuitous bailee is responsible for delivering the property to the true owner.[36]
The owner of property retains a reasonable expectation of privacy when the owner deliberately places the property in the hands of a bailee, such as a package consigned to a mail or delivery service or luggage consigned to a common carrier.[37] This expectation, however, may be diminished by the nature of the bailment. For example, "Common carriers have the right to protect themselves and not be the unwitting carriers of contraband and may search parcels if they have reason to believe they contain contraband."[38]
We hold that the owner of lost or mislaid property, who is in the eyes of the common law an inadvertent bailor, retains a reasonable expectation of privacy in the property, just as she would retain a reasonable expectation of privacy if she were a deliberate bailor who had intentionally consigned the property to a courier, postal service, or common carrier. This expectation of privacy is diminished, however, by the fact that the finder/bailee has an obligation to seek out the owner of the goods and to try to return them.[39] In other words, the owner's *326 expectation of privacy is diminished to the extent that the finder may examine and search the lost property to determine its owner.
The supreme courts of Hawaii and Maine have similarly concluded under the Fourth Amendment that the owner retains a reasonable expectation of privacy in lost property. In State v. May,[40] the Supreme Judicial Court of Maine held that controlled substances found in the defendant's misplaced wallet must be suppressed because he did not abandon the wallet and that the contents of the wallet would remain private. In State v. Ching,[41] the Supreme Court of Hawaii held that controlled substances found in a closed brass cylinder must be suppressed where the cylinder was inside an unzipped leather pouch. The police had found identification before they opened the cylinder, and the defendant retained an expectation of privacy in the contents of the cylinder.[42]
Applying these principles to this case, the trial court correctly determined that Kealey did not abandon her purse,[43] Kealey did not voluntarily relinquish her expectation of privacy as demonstrated by her attempt to find the purse shortly after leaving it where she was trying on shoes.[44] Kealey had no intention of divesting herself of the purse or the women would not have returned to retrieve the purse or behaved so frantically in searching for it. Rather than abandoning the purse, Kealey mislaid the purse. The store stood as a bailee for her when the clerk exerted control over the purse. Kealey remained in constructive possession and retained a reasonable expectation of privacy in the purse, diminished to the extent that the finder would probably search the purse for identification.[45] We hold that the police officers conducted a search governed by the Fourth Amendment when they searched Kealey's purse.

Justification
The Fourth Amendments renders a search conducted without a warrant per se unreasonable unless it falls within the parameters of "a few specifically established and well-delineated exceptions."[46] Accordingly, we must determine whether the police officers' search was justified by one of these exceptions.
The police officers justified their search on the grounds that they were searching for identification. The police had a right, if not an obligation, to search the purse for identification for the purpose of returning the purse.[47] We hold that searching lost or mislaid property for identification is an exception that makes reasonable a warrantless search. The coexistence of investigatory and administrative motives does not invalidate the lawful search for identification. Thus, the police officers did not lose their right to search the purse for identification when they learned the purse contained drugs. Our holding is supported by the fact that Kealey's reasonable expectation of privacy in her misplaced purse is diminished to the extent that a finder would search for identification.
Several further reasons support our holding. First, the Fourth Amendment prohibits unreasonable searches, but it does not metamorphose reasonable searches into unreasonable ones simply because the police officers have additional information of wrongdoing. *327 Second, Kealey's privacy interest in the contents of her purse was already subject to the right of the police to search for identification, and knowledge that Kealey was probably involved in illegal activities does not increase her privacy interest. Third, requiring a search warrant would create a paradox under the circumstances of this case. If we required a warrant, and the magistrate found probable cause to search, then the police would search the purse. But if the magistrate found no probable cause, then the police would be back where they began, and would presumably be entitled to search the purse for identification for the purpose of returning the purse to its owner. Fourth, in the analogous context of inventory searches, courts have held that the presence of an investigatory motive does not invalidate a nonpretexual search to inventory the contents of property seized by police.[48]
Our holding that the police may search lost property for identification is consistent with decisions from other jurisdictions. In State v. Pidcock, the Oregon Supreme Court held that the police properly searched a lost briefcase for identification.[49] In State v. Morton, the Oregon Court of Appeals held that police could search a mislaid purse for identification, even though a motel employee had told the police that the purse contained a syringe.[50] In State v. Ching, the Hawaii Supreme Court held that police could search a mislaid leather pouch for identification.[51]

Article One, Section Seven
Kealey asserts that article one, section seven of the Washington State Constitution precluded a warrantless search of her purse. We do not reach this issue because Kealey did not adequately brief it.[52] In a motion for reconsideration of this opinion, Kealey argues that she was not obligated to brief the proper interpretation of article one, section seven, because the trial court concluded that the search violated section seven and this court should affirm the trial court on this ground. The issue is not whether the trial *328 court relied on section seven, but whether section seven should be interpreted independent of the federal constitution under the facts of this case. We require counsel to brief the issue as "a necessary starting point for a discussion between bench and bar about the meaning of a state constitutional provision"[53] and in order to establish a "principled basis for repudiating federal precedent."[54] Neither in the trial court nor in this court did any party argue or explain why or how section seven should be interpreted independently of the federal constitution, and we decline to embark on this analysis ourselves.

CONCLUSION
Kealey reasonably expected that the contents of her purse would remain private, except to the extent that the finder of the purse, or the police, might search for identification. We hold that searches of misplaced property for identification are an exception to the Fourth Amendment requirement of a search warrant. When the purse was delivered to the police with the information that the purse contained controlled substances, the additional information did not undermine the right of the police to search the purse for identification. Therefore, we hold that the trial court erred in suppressing the evidence of identification. We reverse and remand for further proceedings consistent with this decision.
SEINFELD, C.J., and MORGAN, J., concur.
NOTES
[1] State v. Rivera, 76 Wash.App. 519, 520-21, 888 P.2d 740 (1995).
[2] 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)
[3] See Katz, 389 U.S. at 353, 88 S.Ct. at 512; Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).
[4] Katz, 389 U.S. at 352, 88 S.Ct. at 511.
[5] Smith, 442 U.S. at 737, 99 S.Ct. at 2578.
[6] Smith, 442 U.S. at 742-43, 99 S.Ct. at 2581-82.
[7] Smith v. Maryland, 442 U.S. at 740, 99 S.Ct. at 2580; see State v. Young, 123 Wash.2d 173, 189, 867 P.2d 593 (1994).
[8] State v. Jones, 68 Wash.App. 843, 850, 845 P.2d 1358, review denied, 122 Wash.2d 1018, 863 P.2d 1352 (1993).
[9] Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). See also John Wesley Hall, Jr., 1 Search and Seizure § 2.6, at 56 (2d ed. 1991).
[10] Katz v. United States, 389 U.S. at 351-52, 88 S.Ct. at 511 (citations omitted). See State v. Wolohan, 23 Wash.App. 813, 818, 598 P.2d 421 (1979) (upholding use of police dog to sniff shipped package in semi-public area), review denied, 93 Wash.2d 1008 (1980).
[11] Since the purse belonged to her, we infer that Kealey was one of the two women who left the purse in the department store, although there is no direct evidence on this point. Kealey does not contest that she left the purse in the store. This inference does not affect our analysis.
[12] State v. Jordan, 29 Wash.App. 924, 927, 631 P.2d 989 (1981) (by drawing curtains, individuals demonstrated an expectation of privacy, fact that occupants did not completely succeed in drawing curtains does not diminish the reasonableness of their expectation of privacy); State v. McAlpin, 36 Wash.App. 707, 716, 677 P.2d 185 (by locking briefcase, defendant exhibited a legitimate expectation of privacy), review denied, 102 Wash.2d 1011 (1984).
[13] See State v. May, 608 A.2d 772, 775-76 (Me. 1992) (defendant did not intentionally discard wallet and, therefore, did not relinquish expectation of privacy).
[14] Hall, supra, § 13:3 at 568-69. See Rios v. United States, 364 U.S. 253, 262 n. 6, 80 S.Ct. 1431, 1437 n. 6, 4 L.Ed.2d 1688 (1960) ("passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have `abandoned' it"). See also State v. Moore, 29 Wash.App. 354, 359 n. 1, 628 P.2d 522 (defendant missed bus but still retained privacy in contents of checked luggage), review denied, 96 Wash.2d 1003 (1981).
[15] People v. Loveless, 80 Ill.App.3d 1052, 36 Ill. Dec. 120, 122-23, 400 N.E.2d 540, 542-43 (1980) (by telling officer to put his coat down, defendant regained privacy formerly relinquished when he placed the coat in a public area).
[16] State v. Jones, 68 Wash.App. at 850, 845 P.2d 1358 (quoting Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 144 n. 12, 99 S.Ct. 421, 431 n. 12, 58 L.Ed.2d 387 (1978))).
[17] See Arkansas v. Sanders, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) (citing United States v. Chadwick, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977)).
[18] Arkansas v. Sanders, 442 U.S. at 762 n. 9, 99 S.Ct. at 2592 n. 9.
[19] 31 Wash.App. 889, 890, 645 P.2d 63 (1982).
[20] State v. Johnston, 31 Wash.App. at 892, 645 P.2d 63.
[21] See United States v. Chadwick, 433 U.S. at 13, 97 S.Ct. at 2484.
[22] Search and Seizure, supra, § 1:9, at 17.
[23] See, e.g., Rakas, 439 U.S. at 143, 99 S.Ct. at 430; Katz, 389 U.S. at 352-53, 88 S.Ct. at 511-12.
[24] Katz, 389 U.S. at 352-53, 88 S.Ct. at 511-12.
[25] Rakas, 439 U.S. at 153, 99 S.Ct. at 435 (Powell, J., concurring).
[26] RCW 4.04.010, 9A.04.060.
[27] 1 Am.Jur.2d Abandoned, Lost, and Unclaimed Property §§ 11-13 (Rev. ed. 1994).
[28] Id. at § 4.
[29] Id. at § 6.
[30] 1 Am.Jur.2d, supra, §§ 15-16.
[31] State v. Tidwell, 23 Wash.App. 506, 508, 597 P.2d 434 (1979); City of St. Paul v. Vaughn, 306 Minn. 337, 237 N.W.2d 365, 370-71 (1975) (suspect who hid eyeglass case while being pursued by the police abandoned any reasonable expectation of privacy).
[32] Roy Andrews Brown, Law of Personal Property § 3.1, at 24 (Walter B. Raushenbush, ed., 3rd ed. 1975).
[33] Brown, supra, § 3.5, at 30. See also 1 Am. Jur.2d, supra, § 24, at 32-33.
[34] 1 Am.Jur.2d, supra, § 25, at 32-33; § 10, at 14.
[35] State v. Courtsol, 89 Conn. 564, 94 A. 973, 975 (1915).
[36] Maitlen v. Hazen, 9 Wash.2d 113, 124, 113 P.2d 1008 (1941).
[37] State v. Stanphill, 53 Wash.App. 623, 626-27, 769 P.2d 861 (1989); State v. Moore, 29 Wash. App. at 358-59, 628 P.2d 522; State v. Wolohan, 23 Wash.App. at 817, 598 P.2d 421.
[38] Wolohan, 23 Wash.App. at 817, 598 P.2d 421.
[39] See Maitlen v. Hazen, 9 Wash.2d at 124, 113 P.2d 1008. See generally Brown, Law of Personal Property, supra, at § 3.5.
[40] 608 A.2d at 776.
[41] 67 Haw. 107, 678 P.2d 1088, 1092-93 (1984).
[42] 678 P.2d at 1093.
[43] "[W]e know specifically that this was just a lost item, that it was only lost momentarily, and that it was inadvertent. There was obviously no intention to divest themselves of it or they wouldn't have come back and been so frantic about it. This wasn't an abandonment situation."
[44] See State v. Moore, 29 Wash.App. at 359 n. 1, 628 P.2d 522.
[45] The store personnel had a right, if not an obligation, to search the purse for identification, which resulted in finding the marijuana and eventually the other drugs. The clerk complicated matters somewhat when she lied to Kealey and her companion, feigning ignorance of the purse and its location. But the clerk's actions do not change our analysis because the store manager appropriately notified the police and turned the purse and its contents over to them.
[46] State v. Chrisman, 100 Wash.2d 814, 817, 676 P.2d 419 (1984).
[47] RCW 63.21.060 imposes on the police the obligation to attempt to notify the owner of the lost property. See also Wayne R. LaFave, 2 Search and Seizure § 5.5(d), at 553 (2nd ed. 1987), at 171 (Supp.1995) ("C]ourts recognize a police obligation to undertake to find the owner of property they find or which a finder turns over to them, and on this basis an examination of contents is permissible, but only to the extent needed to discover the owner's identification.") (footnotes omitted).
[48] See, e.g., United States v. Cannon, 29 F.3d 472, 476 (9th Cir.1994) ("We have recently said that an inventory search is valid, even if the searching officer had an investigatory motive, as long as the officer would have conducted the search in question anyway pursuant to police inventory practices."); United States v. Agofsky, 20 F.3d 866, 873 (8th Cir.), cert. denied, ___ U.S. ___, ___, 115 S.Ct. 280, 363, 130 L.Ed.2d 196, 316 (1994) ("The presence of an investigatory motive, even if proven, does not invalidate an otherwise lawful inventory search."); United States v. Rodriguez-Morales, 929 F.2d 780, 787 (1st Cir.1991) ("[t]he coexistence of investigatory and caretaking motives will not invalidate the seizure."), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992); United States v. Frank, 864 F.2d 992, 1001 (3rd Cir.1988), cert. denied, 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989); United States v. Orozco, 715 F.2d 158, 161 (5th Cir. 1983) (per curiam); People v. Hauseman, 900 P.2d 74, 78 (Colo.1995).
[49] 306 Or. 335, 759 P.2d 1092, 1095-96 (1988), cert. denied, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). While we agree with the Oregon court that the police had the right to search for identification, for the reasons stated above, we disagree with the dictum, "Had the deputies opened the manila envelopes in search of contraband, they would have violated defendant's state and probably federal constitutional rights." 759 P.2d at 1096.
[50] 110 Or.App. 219, 822 P.2d 148, 149-50 (1991). The search in Morton violated the defendant's rights because the police searched a closed cigarette case even after finding seven pieces of identification in the purse. 822 P.2d at 150.
[51] 678 P.2d at 1092-93. As in Morton, the search in Ching exceeded a reasonable search when the police opened a sealed container after finding several pieces of identification. 678 P.2d at 1093.
[52] State v. Cantrell, 124 Wash.2d 183, 190 n. 19, 875 P.2d 1208 (1994); See State v. Wojtyna, 70 Wash.App. 689, 691-93, 855 P.2d 315 (1993), review denied, 123 Wash.2d 1007, 869 P.2d 1084 (1994).
[53] Justice Robert F. Utter, The Practice of Principled Decision-Making in State Constitutionalism: Washington's Experience, 65 Temp.L.Rev. 1153, 1162 (1992) (quoted in Collier v. City of Tacoma, 121 Wash.2d 737, 765, 854 P.2d 1046 (1993) (Durham, J., concurring)).
[54] State v. Gunwall, 106 Wash.2d 54, 60, 720 P.2d 808 (1986).